# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2011         Decided July 17, 2012

No. 10-5153

MELVIN J. TAYLOR,
APPELLANT

v.

EDWARD F. REILLY, JR., CHAIRMAN, U.S. PAROLE
COMMISSION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00749)

*Doug Keller*, Supervising Attorney, Georgetown University Law Center Appellate Litigation Program, argued the cause as *amicus curiae* in support of appellant. With him on the briefs were *Steven H. Goldblatt*, Director, *Nilam A. Sanghvi*, Supervising Attorney, and *Blake Holleman* and *Ana Olarte del Castillo*, Student Counsel.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Kenneth A. Adebonojo*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

GARLAND, *Circuit Judge*: Plaintiff Melvin Taylor alleges that U.S. Parole Commission officials violated his rights under the Ex Post Facto Clause by applying the Commission's parole regulations at his parole hearings. We conclude that application of those regulations did not violate any clearly established constitutional right of which a reasonable official would have known at the time of the hearings. Accordingly, we affirm the district court's dismissal of Taylor's damages suit on the ground of qualified immunity.

I

In 1993, Taylor was convicted in District of Columbia Superior Court of the crimes of threatening to injure a person and manslaughter, and he was sentenced to a maximum of 45 years in prison. Under that sentence, Taylor would become eligible for parole after serving one-third of the maximum period, minus any good-time credits. At the time of Taylor's conviction, the District of Columbia had its own parole board that relied on regulations published in 1987. *See Taylor v. Craig*, 2009 WL 900048, at *1 (S.D. W. Va. Mar. 24, 2009); D.C. MUN. REGS. tit. 28, §§ 204.1-.22 (1987) ("1987 Regulations"). In 1997, Congress brought the D.C. parole system under the jurisdiction of the U.S. Parole Commission (USPC). *See* National Capital Revitalization and Self-Government Improvement Act, Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745-46 (codified at D.C. CODE § 24-131). And in

2000, the USPC adopted its own regulations regarding suitability for parole, 28 C.F.R. §§ 2.70-.107 ("2000 Regulations"), which it made applicable to D.C. Code offenders like Taylor, 65 Fed. Reg. 45,885 (July 26, 2000); *see* 28 C.F.R. § 2.70(a).

At Taylor's first parole hearing in 2001, the USPC applied the 2000 Regulations and denied him parole. *Taylor v. Craig*, 2009 WL 900048, at *2. Taylor came up for parole again in 2005, but, again based on the 2000 Regulations, the Commission found that Taylor would not be suitable for parole for several more years. *Id.*

In 2005, Taylor filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of West Virginia, the district in which he was then incarcerated. The petition alleged that application of the 2000 Regulations, rather than the 1987 Regulations, at both his 2001 and 2005 hearings violated his rights under the Ex Post Facto Clause of the Constitution. Taylor relied principally upon *Garner v. Jones*, in which the Supreme Court held that retroactive application of parole guidelines may violate the Ex Post Facto Clause if it creates a "significant risk" of longer incarceration. 529 U.S. 244, 251-52, 255 (2000). After engaging in a detailed analysis that compared the USPC's 2000 Regulations to D.C.'s 1987 Regulations as they might have applied to Taylor, the habeas court concluded: "It appears that Petitioner may have a meritorious claim that the USPC violated the Ex Post Facto Clause when it retroactively applied the 2000 regulations to his parole hearings." *Taylor v. Craig*, 2009 WL 900048, at *13. Nonetheless, the court held that "[a]lthough the USPC's actions may have created a significant *risk* of an increased period of incarceration," that was "by no means certain" because the Board had "ample discretion to depart from the parole decision suggested by a strict application of the [1987] regulations." *Id.*

Thus, the court said, a victory for Taylor would have "[a]t best . . . entitled [him] to a new parole hearing with instructions to the USPC to exercise its discretion within the framework created by [D.C.'s] 1987 Regulations." *Id.* Concluding that the only kind of relief available for such a claim was a change in "the procedures of parole-granting entities" rather than release, the court dismissed Taylor's petition for habeas corpus under 28 U.S.C. § 2241, but suggested that a claim for relief might have been appropriate had Taylor sued under 42 U.S.C. § 1983. *Id.* at *13-15 (citing *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)).

Thereafter, Taylor filed the instant Section 1983 complaint against four Parole Commissioners who served on the USPC at the time of his hearings, and against one Parole Examiner who, he alleged, presided over his 2005 parole hearing.[1] Taylor sought a declaratory judgment that the defendants' application of the 2000 Regulations violated the Ex Post Facto Clause, an injunction barring the defendants from relying on those regulations at his future parole proceedings, an injunction ordering them to hold a new hearing applying the 1987 Regulations, and compensatory and punitive damages. In the summer of 2009, responding to similar lawsuits, the USPC adopted a rule entitling inmates like Taylor to new parole hearings in which the 1987 D.C. rules would be applied. Appellees' Br. 6; *see* 74 Fed. Reg. 34,688 (July 17, 2009) (interim rule); 74 Fed. Reg. 58,540 (Nov. 13, 2009) (final rule) (codified at 28 C.F.R. § 2.80(o)). After a new hearing at which the 1987 Regulations were applied, Taylor's parole was again

---

[1] *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005) (noting that "a cause of action under § 1983 will lie against the individual members of the [United States Parole] Commission" when, "pursuant to the [National Capital] Revitalization Act," they preside in matters involving D.C. Code offenders).

denied.  Parole Hearing Summary (July 28, 2009) (J.A. 36-40); Oral Arg. Recording at 25:50.

The defendants moved to dismiss Taylor's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  The motion argued that Taylor's claims for declaratory and injunctive relief were moot in light of the new hearing he had been accorded, and that the defendants were protected against Taylor's damages claims by absolute immunity or, in the alternative, qualified immunity. Agreeing with all of the defendants' arguments, the district court granted the motion the dismiss.  *Taylor v. Reilly*, 2010 WL 891276 (D.D.C. Mar. 9, 2010).  In upholding the defense of qualified immunity, the court found:  "[I]t was not clearly established in 2005 -- nor is it today -- that the Commission's retroactive application of its guidelines violated the *ex post facto* clause" because "such a determination depends on the facts of the particular case."  *Id.* at *2 n.2.

Thereafter, Taylor appealed, and we appointed amicus curiae to present arguments on his behalf.[2]  Taylor does not contest the district court's finding that his claims for declaratory and injunctive relief are moot.  He does, however, maintain his quest for damages, arguing that neither absolute nor qualified immunity protects the defendants.  Because we conclude that the defendants are entitled to qualified immunity, we do not address the issue of absolute immunity.

II

We review a dismissal for failure to state a claim under Rule 12(b)(6) de novo.  *Muir v. Navy Fed. Credit Union*, 529

---

[2]For purposes of this opinion, we will attribute to Taylor the arguments made by amicus.

F.3d 1100, 1108 (D.C. Cir. 2008).  In so doing, we "'accept as true all of the factual allegations contained in the complaint.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

The Supreme Court has held that "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Exercising that discretion, we begin (and end) with an examination of whether the right the plaintiff asserts was "clearly established" at the time of his 2001 and 2005 parole hearings.

The operation of the "clearly established" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  The Court has explained, for example, that although "the right to due process of law is quite clearly established by the Due Process Clause," that level of generality is too high for purposes of qualified immunity because "there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." *Id.* The same can "be said of any other constitutional or statutory violation." *Id.*  Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.  This does "not require a case directly on point, but

existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 131 S. Ct. at 2083; *see Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). In determining whether the state of the law was "clearly established" at the time of the action complained of, "'we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view' -- if there is one." *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (quoting *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008)).

Taylor's complaint is based upon an alleged violation of the Ex Post Facto Clause, which "bar[s] enactments which, by retroactive operation, increase the punishment for a crime after its commission." *Garner*, 529 U.S. at 249; *see* U.S. CONST. art. I, § 9, cl. 3; *id.* § 10, cl. 1. "Retroactive changes in laws governing parole of prisoners, *in some instances, may be* violative of this precept." *Garner*, 529 U.S. at 250 (emphasis added). But retroactive changes do not always violate the Clause. "The question," the Court held in *Garner*, "is whether the [new law] creates a significant risk of prolonging [the prisoner's] incarceration." *Id.* at 251.

As *Garner* explained, "[w]hether retroactive application of a particular change in parole law respects the prohibition on *ex post facto* legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account." *Id.* at 250. "When the rule does not by its own terms show a significant risk, *the [prisoner] must demonstrate*, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Id.* at 255 (emphasis added). In such a case, the prisoner "must show that as applied *to his own sentence* the law created a significant risk of increasing his

punishment." *Id.* (emphasis added). This requires a "rigorous analysis of the level of risk created by the change in law." *Id.*

In this case, whether retroactive application of the 2000 Regulations violates the Clause is "a question of particular difficulty," *id*. at 250. The 2000 Regulations instruct the USPC to calculate a Total Guideline Range to determine the number of months a prisoner should serve before he is suitable for parole. *See Phillips v. Fulwood*, 616 F.3d 577, 578-79 (D.C. Cir. 2010); 28 C.F.R. § 2.80(f)-(*l*). The first step is to ascertain the minimum number of months the prisoner must serve before he becomes eligible for parole, a determination based on the maximum sentence imposed by the court and the prisoner's good-time credits. *See Taylor v. Craig*, 2009 WL 900048, at *5. Next, a "Base Point Score" is determined by assessing three categories: risk of recidivism, current or prior violence, and whether the crime involved the death of a victim or a high level of violence. 28 C.F.R. § 2.80(f). The first category alone involves application of six factors. *See Taylor v. Craig*, 2009 WL 900048, at *5; 28 C.F.R. § 2.20 Items A-F. The Base Point Score yields a base guideline range, which is added to the minimum number of months the prisoner must serve before becoming eligible for parole. 28 C.F.R. § 2.80(h)-(m). The result is then adjusted, based on the presence of specified aggravating or mitigating factors, to produce the Total Guideline Range. *See id.* (methods for determining minima and maxima).[3]

As the district court in Taylor's habeas case noted, although "most of the factors" considered under the 2000 Regulations were incorporated from the 1987 Regulations, *Taylor v. Craig*,

---

[3]The adjustment factors include: disciplinary infractions incurred during the prisoner's incarceration; the gravity of such infractions; and superior achievement in areas such as educational, vocational, and counseling programs. 28 C.F.R. § 2.80(j)-(k); *see id.* § 2.36.

2009 WL 900048, at \*9, "the two sets of regulations substantially differ in how they structure the discretion to grant or deny parole," *id.* at \*7. The discrepancy arises in part from the fact that the 2000 Regulations produce a guideline range of *time* during which an inmate becomes suitable for parole (*i.e.*, after 100-120 months), whereas the 1987 Regulations produce a point scale in which those with a lower point score are deemed suitable for parole. *Id.* at \*7. Both sets of regulations allow for departures from their guidelines.

The 2000 Regulations do not, on their face, show a significant risk of prolonged incarceration over the 1987 Regulations for *every* prisoner to whom they may be applied. Certainly no case has so held. In *Fletcher v. District of Columbia* (*Fletcher I*), 391 F.3d 250 (D.C. Cir. 2004), this court did not even attempt to determine whether application of the 2000 rather than the 1987 Regulations constituted an Ex Post Facto violation, instead remanding to the district court for a fact-specific analysis. In a parallel habeas case, *Fletcher v. Reilly* (*Fletcher II*), 433 F.3d 867 (D.C. Cir. 2006), we again remanded without making a determination. Indeed, although we found "facial distinctions" between the regulations that were potentially significant for the petitioner's case, we held only that those distinctions were "sufficient to warrant factual development . . . in order to determine whether" application of the later regulations constituted an Ex Post Facto violation. *Id.* at 879.[4] And in *Sellmon v. Reilly*, the district court found that

---

[4]None of those "facial distinctions" are present here. The reference in *Fletcher II* was to regulations regarding *re*parole decisions (that is, decisions to parole individuals who had previously been paroled and were returned to prison after violating parole or committing further offenses). For that category of prisoners, *Fletcher II* found facial differences between the 1987 and 2000 Regulations, in that the latter did not take account of a prisoner's rehabilitative

application of the 2000 rather than the 1987 Regulations did not, in fact, lead to an increased sentence for one of the prisoner plaintiffs. 551 F. Supp. 2d 66, 93 (D.D.C. 2008); *see also Phillips*, 616 F.3d at 582 (concluding that application of the 2000 Regulations did not produce a longer period of incarceration for the plaintiff in light of the Board's upward departure from the guidelines).

Nor is it apparent on the face of the 2000 Regulations that, "as applied to [Taylor's] own sentence," those regulations "created a significant risk of increasing his punishment." *Garner*, 529 U.S. at 255. Taylor insists that it *is* apparent, citing the decision of the district court in his habeas case. But that court held no more than that "[i]t *appears* that Petitioner *may have* a meritorious claim" of a violation of the Ex Post Facto Clause. *Taylor v. Craig*, 2009 WL 900048, at \*13 (emphasis added). Even that qualified verdict was reached only after the court conducted a five-page, "searching comparison" of the manner in which the two sets of regulations applied to Taylor -- including an analysis of the nature of Taylor's offenses, his background, and his conduct subsequent to conviction. *See id.* at \*7-11; *see also id.* at \*3 (stating that Taylor's Ex Post Facto argument presents a "thorny question"). In part, this is because applying the two sets of regulations requires an apples-to-oranges comparison: as noted above, while the 2000 Regulations generate ranges of time, the 1987 Regulations generate a point scale on which those with fewer points are deemed presumptively suitable for parole. *See id.* at \*7.

In short, there is no sense in which the new "rule . . . by its own terms show[s] a significant risk" of increased incarceration. *Garner*, 529 U.S. at 255. Accordingly, if there were a violation here, it was not a violation that any "reasonable official would

accomplishments between his two incarcerations. *Id.* at 877-79.

[have] underst[oo]d" at the time he applied the 1987 Regulations to Taylor's case. *Anderson*, 483 U.S. at 640; *cf. Garner*, 529 U.S. at 255 (finding, in light of the prisoner's criminal history, that it was "difficult to see how" a new parole rule "increased the risk of [petitioner's] serving a longer term," notwithstanding that the new rule provided parole reviews after 8-year rather than 3-year intervals). Accordingly, we cannot conclude that such an application violated "clearly established" law. *Anderson*, 483 U.S. at 640.

Taylor argues that the parole officials were at least "on notice" that they had to conduct a fact-specific comparison of both the 1987 and 2000 Regulations before deciding to apply the latter to his case. Br. 44. But Taylor cites no court decision, either before or after his 2001 and 2005 parole hearings, that found a violation of the Ex Post Facto Clause based merely on a failure to conduct such a comparison. *Cf. Wilson v. Layne*, 526 U.S. 603, 617 (1999) (finding no clearly established violation of law when the petitioners failed to cite "any cases of controlling authority in their jurisdiction" holding that the practice at issue was unlawful). Taylor maintains that our 2004 decision in *Fletcher I* was such a case, but he is mistaken. *Fletcher I* held nothing more than that the plaintiff's Section 1983 case could not be dismissed on the ground that "a parole guideline is not a 'law' within the proscription of the Ex Post Facto Clause," and it therefore remanded the case for the district court to conduct "proceedings consistent with *Garner*." *Fletcher I*, 391 F.3d at 251. Our disposition was a procedural direction to the district court. We issued no direction to the defendant Parole Commission and reached no conclusion whatsoever with respect to a violation of the Ex Post Facto Clause.

Indeed, even if it were assumed that there are circumstances in which parole officials are required by the Ex Post Facto

Clause to compare the impact of two sets of regulations before applying one, what those circumstances are and whether they apply to Taylor's case are both unclear.[5]  Recall that, "[w]hen the rule does not by its own terms show a significant risk," *Garner* places the burden on the plaintiff to "demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Garner*, 529 U.S. at 255.  In *Fletcher II*, we held that the petitioner was "entitled to a searching comparison of the old and new reparole regimes" by the district court considering his complaint, 433 F.3d at 879, but did so only after first concluding that he had "presented a creditable claim" of a significant risk of longer incarceration, *id.* at 878.  We have never addressed whether such a "creditable claim" is either necessary or sufficient to mandate an initial searching comparison by parole officials (and we do not mean to suggest an answer to that question here).  Nor has Taylor ever contended that he presented such a creditable claim to the parole officials who are defendants here -- or that he even asked them to apply the 1987 Regulations to his case.  In these circumstances, it was not a violation of clearly established law for the parole officials to fail to conduct a comparison of the two sets of regulations.

III

A parole official applying the 2000 Regulations at Taylor's parole hearings would not have had reason to know that doing

_____

[5]We note that a 2009 regulation issued by the USPC now requires hearing examiners, in specified circumstances, to evaluate prisoners' cases using the 1987 Regulations.  28 C.F.R. § 2.80(o).  As discussed in Part I, Taylor was accorded a new hearing pursuant to that regulation, but his parole was again denied.  *See* Parole Hearing Summary (July 28, 2009) (J.A. 36-40); Oral Arg. Recording at 25:50.

so would create a "significant risk" of longer incarceration than applying the 1987 Regulations.  If there were any difference in the ultimate outcome for Taylor, it would not have become apparent without a searching comparison of the application of each of the two sets of regulations to the facts of his case. Hence, although it was clearly established at the relevant times that applying new parole regulations creating a significant risk of longer incarceration violates the Ex Post Facto Clause, it would not have been clear to reasonable parole officials that applying the new regulations to Taylor would actually create such a risk.  Nor had any case required officials -- particularly officials who did not already have a basis for believing there was such a risk -- to conduct a searching comparison before deciding which regulations to apply.

Accordingly, the judgment of the district court is

*Affirmed*.

KAVANAUGH, *Circuit Judge*, concurring: The Government contends that the U.S. Parole Commissioners should receive absolute immunity for their decision to deny parole to Taylor. The Government's fallback argument is qualified immunity. Taylor's claim fails even if the Parole Commissioners are entitled only to qualified immunity, and the Court thus correctly affirms dismissal of the suit. The Court does not address the Government's absolute immunity argument. I write separately simply to make clear that the Government's absolute immunity theory is unavailing.

The Government claims that Parole Commissioners are like judges or agency adjudicators who are entitled to absolute immunity for their judicial or quasi-judicial decisions. But the Government's position misunderstands the office of Parole Commissioner. The Supreme Court has afforded absolute immunity to those adjudicative officials who operate independently and are not removable at will by the President or another Executive Branch officer. *See, e.g.*, *Butz v. Economou*, 438 U.S. 478, 513-14 (1978). By contrast, Executive Branch officials who are removable at will are ordinarily entitled only to qualified immunity for their decisions, even when their actions are quasi-judicial. (An exception, not applicable here, is the absolute immunity granted to prosecutors for certain prosecutorial decisions.) Parole Commissioners are Executive Branch officials who are removable at will by the President. *See* Constitutionality of Legislation Extending the Terms of Office of U.S. Parole Commissioners, 18 Op. O.L.C. 166, 171 (1994). Therefore, the Supreme Court's precedents do not support granting absolute immunity to Parole Commissioners for their parole decisions.